# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RAINBOW USA, INC., ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 06-4578** |
| **NUTMEG INSURANCE COMPANY, ET AL.** | **SECTION "L" (1)** |

## ORDER & REASONS

Currently pending before the Court are Defendant Nutmeg Insurance Company's Motion for Partial Summary Judgment (Rec. Doc. 58) and Plaintiff Rainbow USA, Inc.'s Cross-Motion to Strike and Motion for Partial Summary Judgment (Rec. Doc. 72). The Court heard oral argument on the motions and took them under submission. For the following reasons, Nutmeg's Motion for Partial Summary Judgment IS GRANTED IN PART AND DENIED IN PART and Rainbow's Cross-Motion for Partial Summary Judgment IS DENIED.

## I.        BACKGROUND

This case arises out of insurance claims regarding several commercial properties owned or leased by the Plaintiff, Rainbow USA, Inc. ("Rainbow"). Rainbow, a New York corporation with its primary place of business in New York, is engaged in the retail clothing business. Rainbow and its subsidiaries owned or leased certain commercial properties in Louisiana and Mississippi that suffered damage resulting from Hurricane Katrina.

Rainbow obtained both an underlying insurance policy and an excess level policy for certain of its commercial properties over the relevant period of September 1, 2004, through September 1, 2005. Crum & Forster issued the underlying insurance policy, which provides certain coverage up to $10 million per occurrence; the Defendant, Nutmeg Insurance Company

("Nutmeg"),[1] issued the excess level policy, which provides certain coverage up to $40 million above the initial $10 million provided for by the underlying policy. In August 2005, Hurricane Katrina inflicted significant damage on certain of Rainbow's commercial properties. Crum & Forster, the primary level insurer, has agreed to pay or has paid up to the limits of the primary policy for damages to the properties as well as Rainbow's subsequent loss of business income. Nutmeg, the excess level insurer, contends that certain damages and business interruption losses claimed by Rainbow above the limits of the primary policy are excluded under the terms and conditions of the excess level policy.

## A. THE 2004-05 NUTMEG POLICY

Before addressing the substance of the parties' arguments, it is appropriate to provide a brief overview of the complex relationship between Rainbow and Nutmeg. Through a series of retail brokers, wholesale brokers, and insurance underwriters, Rainbow has purchased annual excess level insurance policies from Nutmeg every year since 1998. Dachs & Sons, Inc., ("Dachs") is a retail broker that regularly obtains property insurance for Rainbow, including the policy at issue in this case. Harvey Dachs is the president, CEO, and sole stockholder of Dachs. Hartan Brokerage, Inc., ("Hartan") is a wholesale broker that acts as an intermediary between insurance companies such as Nutmeg and retail brokers such as Dachs. Joe Silba, a Hartan employee, assisted in negotiating the renewal of the Nutmeg 2004-05 policy at issue in this litigation. First State Specialty Property ("First State"), an underwriting facility for The Hartford, underwrites insurance policies issued by, among other companies, Nutmeg, which is itself a subsidiary of The Hartford. Dee Torgerson, an Executive Underwriter for First State, assisted in preparing the Nutmeg policy at issue in this case, as well as previous excess level policies issued to Rainbow.

---

[1] Nutmeg is a Connecticut corporation with its primary place of business in Hartford, Connecticut.

The 2004-05 Nutmeg policy is an excess level policy that insures Rainbow for "all risks of direct physical loss or damage to covered property except as excluded" by certain conditions. As the excess level policy, the Nutmeg policy follows the form of the underlying Crum & Forster policy, adopting the terms and conditions of the underlying policy subject to certain additional exclusions and modifications. (*See* Rec. Doc. 58-2, at FS0000018). Pursuant to the terms of the excess level policy, Nutmeg would not be liable "for more than its pro rata share, being 100% of the 'ultimate net loss', in excess of the total amount of underlying insurance." *Id.* at FS0000016. The policy further required that any change to the policy be made by endorsement issued by Nutmeg. *Id.* at FS0000014, FS0000019.

From 1998 through the 2004-05 policy, every excess policy issued by Nutmeg contained, *inter alia*, the following similar provisions: (1) an Occurrence Limit of Liability endorsement, which, according to Nutmeg, differed from the terms of the underlying Crum & Forster policies in that it limited the annual aggregate loss for all occurrences, regardless of the number of occurrences, to $40 million; and (2) the following "Ultimate Net Loss" provision:

> I. "Ultimate Net Loss", as used herein, means the actual loss or damage sustained by the Named Insured (including any deductible or self-insured retention amount) as a direct result of the perils insured against in this Policy to property covered hereunder arising from any one loss or disaster, after making deductions for salvage and subrogation and recoveries from any source other than this Policy and the underlying insurance and excess insurance policies, but in no event shall the "ultimate net loss" exceed the aggregate amount produced by the lesser of:
>
> > a. the value stated for each individual item on the latest statement of values on file with [Nutmeg], or
> >
> > b. the amount of loss to each individual item on the latest statement of values on file with [Nutmeg]
> >
> > reduced by any amounts
> >
> > > a. recoverable from underlying insurance, or

b.  within applicable deductibles or self-insured retentions.

*Id.* at FS0000017.  With respect to the values listed in the Statement of Values filed with

Nutmeg, the 2004-05 policy further provides that, "SUBJECT TO VALUES REPORTED ON

SOV. IF NO VALUES REPORTED FOR A CERTAIN COVERAGE THEN THERE WILL BE

NO COVERAGE FOR THAT ITEM AT TIME OF LOSS."  *Id.* at FS0000022.  In contrast, the

underlying policies issued by Crum & Forster generally did not contain similar limitations,

instead providing that any values listed in the Statement of Values were to be used for premium

purposes only.

     The 2004-05 Nutmeg policy also excludes flood and earthquake damage occurring in

certain geographic locations.  Specifically, the policy insures against "ALL RISK OF DIRECT

PHYSICAL LOSS, INCLUDING FLOOD AND EARTHQUAKE, EXCLUDING

CALIFORNIA EARTHQUAKE, EXCLUDING FLOOD IN FEMA ZONES A AND V AS

PROVIDED IN THE POLICY ATTACHED."  *Id.* at FS0000011.  Endorsement A of the policy

is the EXCEPTIONS TO UNDERLYING INSURANCE, which includes the following

exclusions:

          ITEM 9.     PERILS EXCLUDED, ITEM P. & Q. ARE ADDED AS
                      FOLLOWS:

                      ITEM P. & Q. ARE ADDED AS FOLLOWS:
                      P. EARTHQUAKE IN THE STATE OF CALIFORNIA
                      Q. FLOOD IN FLOOD FEMA ZONE A & V AND ANY SUB
                      ZONES THEREOF.

*Id.* at FS0000021.  The parties dispute the meaning of term "sub zones" as that term is used in

the policy.  Whereas Rainbow contends that the term is vague and/or meaningless, Nutmeg

argues that, in context, the phrase refers to all FEMA zones that begin with the letters "A" or

"V."

**B. COMMUNICATIONS PRIOR TO THE ISSUANCE OF THE 2004-05 POLICY**

In August 2004, Harvey Dachs requested that the Nutmeg policy be renewed for the 2004-05 year.  Dee Torgerson of First State prepared a quote letter, which included both the Statement of Values limitation and the flood zone exclusion set forth above.  In addition, the quote letter also included the following language: "[T]he conditions contained in [this] quote are not necessarily in compliance with the conditions requested in your submission.  Furthermore, we are not obligated to provide coverage not addressed in this quote even though it may have been requested in your submission."  (*See* Rec. Doc. 58-15, at FS0000099).  Joe Silba of Hartan forwarded the quote letter to Mr. Dachs via facsimile.  On August 31, 2004, Mr. Dachs sent documentation to Mr. Silba stating, "Renew as expiring.  Delete Occurrence Limit of Liability endorsement.  Follow form of primary policy of Crum and Forster."  (*See* Rec. Doc. 58-14).  Mr. Silba received the documentation, signed it the same day, and responded that Hartan binders would follow.  *Id.*[2]  On the same day that Mr. Silba signed the binders, he also sent an e-mail to Ms. Marge Charpentier, an assistant to Ms. Torgerson, in which he stated that he was "binding as per authorization" and that "Hartan binders to follow."  (*See* Rec. Doc. No. 75-V).  Nutmeg, however, contends that it did not receive notification of Dachs' request and that, prior to Hurricane Katrina, no one from Rainbow, Dachs, or Hartan ever asked Ms. Torgerson or anyone else at Nutmeg to issue property insurance that was not limited by the values set forth in the Statement of Values.

Shortly after receiving Mr. Dachs' request, Mr. Silba prepared a binder that contained substantially the same language as set forth in Ms. Torgerson's quote letter—without any

---

[2] Although Mr. Silba was too ill to give a deposition in this litigation, Mr. Darragh, Mr. Silba's supervisor, testified that, based upon his experience in supervising Mr. Silba, it would have been "unusual" for Mr. Silba to have signed the binder without first receiving authorization from Nutmeg, although it could have happened.  *See* Deposition of Vincent Darragh at p. 132-37, 139-41.  Unfortunately, shortly after the inception of this litigation, Mr. Silba passed away.

reference to the deletion of policy language or conditions, but with the same provision indicating that Nutmeg would not be obligated to provide coverage not addressed in the binder even though it may have been requested in the submission. Mr. Silba forwarded the binder to Mr. Dachs via facsimile on September 7, 2004. On September 9, 2004, Mr. Silba signed and mailed to Mr. Dachs a full copy of the policy binder, which again contained the same language and exclusions as set forth in the quote letter. Several months later, on March 1, 2005, Nutmeg issued the 2004-05 policy.

### C. COMMUNICATIONS FOLLOWING THE ISSUANCE OF THE 2004-05 POLICY

On or about April 17, 2005, Mr. Dachs sent Mr. Silba a written request to remove the connection between the dollar amounts contained in the Statement of Values and the limits that Nutmeg would pay for a covered loss. There is no evidence that this request was ever conveyed to Nutmeg, however, and Nutmeg contends that it did not receive any additional communication regarding the policy or its exclusions until Hartan conveyed a request by Mr. Dachs to delete the Occurrence Limit of Liability endorsement on July 28, 2006. After receiving the request, Ms. Torgerson sent an email to Thomas Conboy, her supervisor, stating:

Tom,

When we issued this policy form, which was our follow form over C& F primary, we inadvertently added the PE4, Occurrence limit wording. Our follow form includes the ultimate net loss wording, which is the same as the PE4. The underlying policy also includes similar wording. My quote specifically states that we only provide coverage for locations and values as stated on the SOV. That language was additionally made a part of our policy by endorsement. The broker has requested that we remove the PE4 as it is not necessary and provides confusion as part of the policy. This account was bound 9-1-04. The underlying policy was received 1-18-05 and we issued our follow form on 2-28-05. There was a Katrina loss (first I've heard about it). It may below the attachment point. I don't believe that a loss on this account was reported to us. The locations have not been repaired and the BI is running up, as I understand it.

I don't believe that removing the PE4 changes the policy, but merely corrects a mistake that was made when issuing the policy.

Please let me know if ok to remove the endorsement.

(*See* Rec. Doc. 58-21).

On July 28, 2006, Ms. Torgerson prepared a facsimile to Vincent Darragh, the Senior Vice President in the Property Division at Hartan, further explaining Nutmeg's decision to delete the Occurrence Limit of Liability endorsement as follows:

Vinny,

Confirming our various conversations, attached please find the endorsement deleting the form PE4 [Occurrence Limit of Liability endorsement]. This is a redundant endorsement as similar language is contained in the excess follow form as well as the underlying primary policy.

The deletion of this form in no way changes the underwriter's intent, nor the terms and conditions outlined in the quote letter and under which this account was bound. Deletion of the PE4 is merely a correction to an oversight that was made when the policy was issued.

Also, per your request, we have included a copy of the Crum and Forster underlying policy form that was provided to us by your office. This form was used as the underlying coverage we followed, subject to the terms and conditions as set forth in our policy. We have not received any changes or endorsements to this policy form issued by C&F since its inception.

(*See* Rec. Doc. 58-20).

Ms. Andrea Matott was the Nutmeg claim adjustor who handled Rainbow's Hurricane Katrina claims. In addition to assigning Ms. Matott to adjust the claims, Nutmeg also retained Douglas White, an outside adjuster from the firm of White – Hart & Associates, to conduct an investigation into the condition of the properties. On August 21, 2006, Mr. White sent a Reservation of Rights letter to Rainbow listing several potential coverage defenses, including the flood exclusion. The letter did not comment on the Ultimate Net Loss provision or the methodology by which Nutmeg would calculate business interruption losses, but rather reserved Nutmeg's rights to defend the claims pursuant to the terms of the policy. In addition to the

Reservation of Rights, Mr. White also issued four reports between August 14 and November 2, 2006. In his third report, dated October 23, 2006, Mr. White stated:

> Next, we need to put together a game plan so as to how we are going to approach the extended period of indemnity. The insured is open to our suggestions on how to deal with the 7 stores that will never reopen in their current locations. We are not at all happy with the time element of extending the lease, and we certainly believe something needs to be negotiated in this area.

(Rec. Doc. 75-D). In the same report, Mr. White also noted that the phrase "sub zone" in the policy exclusions appeared to be unique to the 2004-05 Nutmeg policy and did not specifically correspond to terms used by FEMA or the National Flood Insurance Program. *Id.* According to Mr. White's report, "FEMA knows nothing about subzones. There is nothing in a National Flood insurance policy making reference to a sub zone. Thus, the language … appears to be unique to the insurance company." *Id.*

On August 23, 2006, Rainbow filed suit in this Court seeking $2,432,804 for damages to the building structures and improvements to its commercial properties; $2,811,064 for damage and destruction to its retail stock; $695,049 for damage to contents other than stock; and $31,000,000 for business interruption losses. Nutmeg disputes these amounts and contends that Rainbow is attempting to claim damages that are not covered under the excess level policy.

## II.     PRESENT MOTIONS

Both parties have filed motions for partial summary judgment on a number of issues. The Defendant, Nutmeg, seeks partial summary judgment on three issues: first, that in measuring the "ultimate net loss" payable under the Nutmeg 2004-05 policy, the measure is limited by the value for each individual item set forth in the Statement of Values filed with Nutmeg; second, that the Nutmeg 2004-05 policy exclusions for flood in "Fema Zones A and V and sub zones thereof" include all zones designated by FEMA that begin with the letter "A" or "V"; and third,

that Rainbow is not entitled to bad faith penalties under Louisiana Revised Statutes § 22:1892 (previously cited as § 22:658) and/or § 22:1973 (previously cited as § 22:1220).

In addition to opposing Nutmeg's requests for partial summary judgment, Rainbow has also filed its own cross motion for partial summary judgment. Specifically, Rainbow seeks judgment as a matter of law on the following issues: first, that the Nutmeg policy does not exclude damages to any of Rainbow's properties caused by flood, as the term "sub zones" is vague and/or meaningless and does not include, for example, FEMA flood zones A1 through A30; and, second, that Rainbow's business interruption claims are governed by the terms in the underlying Crum & Forster policy, as the excess level policy follows the form of the underlying policy and does not specifically alter the terms or methodology by which business interruption losses are calculated pursuant to the Crum & Forster policy.

## III.    LAW & ANALYSIS

Summary judgment is appropriate in a case if "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). "The moving party bears the burden of demonstrating that there exists no genuine issue of material fact." *McCall v. Focus Worldwide Television Network, Inc.*, No. 07-5447, 2008 WL 3366080, *3 (E.D. La. Aug. 8, 2008). A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In determining whether a genuine issue of material fact exists, the Court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 137 (5th Cir. 2004). Because "only those disputes over facts that might affect the outcome of the lawsuit under governing substantive law will preclude summary

judgment," however, questions that are unnecessary to the resolution of a particular issue "will not be counted." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987). Conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a properly supported motion for summary judgment. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). "[S]ummary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075-76 (5th Cir. 1994).

### A. CHOICE OF LAW

As an initial matter, the parties dispute whether New York or Louisiana law should apply to the various issues pending before the Court. Nutmeg contends that Louisiana law should apply to the issues of contract interpretation because: (1) the action involves insurance policies for property primarily located and damaged in Louisiana; and (2) the action is pending in Louisiana. In the alternative, Nutmeg argues that, even if New York does have an interest in applying its laws to this dispute, the Court should apply the law of the forum state—Louisiana—because there is no actual conflict between the laws of New York and Louisiana regarding the interpretation of insurance policies. Rainbow, however, takes the opposite position, arguing that the Court should apply New York law to the contract interpretation claims because (1) the insurance contract was delivered and bound in New York (2) to insure the assets of a New York business entity (3) with insured properties across several states. Rainbow further suggests that New York and Louisiana courts interpret insurance contracts differently.

When it comes to the issue of bad faith penalties, however, the parties switch positions, even going so far as to expressly adopt their opponent's earlier arguments. With respect to the issue of bad faith penalties only, Nutmeg backs away from its earlier position, instead arguing

that New York has the greater interest for "[a]ll of the reasons that Rainbow proffered as to why New York law applies to the contractual interpretation issues…" (*See* Rec. Doc. 82 at 42). Although Nutmeg earlier found the fact that the damaged properties were located in Louisiana persuasive, in the context of bad faith claims, Nutmeg argues that "[t]he mere fact that the loss occurred in Louisiana is not dispositive for the application of Louisiana law [because] New York's policies would be most seriously impaired if its laws were not applied to this issue." *Id.*

Similarly, Rainbow also backs away from its earlier argument that New York has the greater interest in the application of its laws, instead arguing that the Court should apply Louisiana law only to the issue of bad faith penalties. Although Rainbow earlier found it persuasive that the insurance policy was bound and delivered in New York to a New York corporation, Rainbow does not hesitate to argue that the Court should apply Louisiana law to the issue of bad faith penalties because Louisiana "is where the loss that Nutmeg failed to adjust took place." (*See* Rec. Doc. 86 at 20).

In diversity cases such as this one, federal courts must apply state substantive law. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). A district court sitting in diversity applies the choice-of-law rules of the forum state.[3] *Guaranty Nat'l Ins. Co. v. Azrock Indus., Inc.*, 211 F.3d 239, 243 (5th Cir. 2000). As the Fifth Circuit has explained, however, "[i]f the laws of the states do not conflict, then no choice-of-law analysis is necessary" and the law of the forum state should be applied. *See Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002); *see also W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990) (explaining that a court need not "go through the motions" of a choice-of-law analysis when the substantive

---

[3] Although both Nutmeg and Rainbow are national corporations and the 2004-05 Nutmeg policy provided insurance coverage to properties in a number of different states, the policy does not contain a choice-of-law provision.

decisional law of all relevant jurisdictions is the same).  For the following reasons, the Court

finds that the laws of New York and Louisiana are substantially similar with respect to the

determinative issues in this case, and therefore the Court will apply the law of the forum state,

Louisiana, to the parties' dispute.

Whereas Louisiana's rules for contract interpretation are set forth in the Louisiana Civil

Code and have developed through amendments to the Code, New York's rules for interpreting

contracts have developed through the common law.  Despite their differing jurisprudential

histories, however, both New York and Louisiana law require that insurance policies be

interpreted in accordance with the rules for interpreting contracts in general.  *Compare*

*Cadwallader v. Allstate Ins. Co.*, 02-1637, p. 3 (La. 6/27/03); 848 So. 2d 577, 580 ("An

insurance policy is a contract between the parties and should be construed using the general rules

of interpretation set forth in the Louisiana Civil Code.") *with World Trade Ctr. Props., L.L.C. v.*

*Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003) (applying New York law of contracts to

interpretation of insurance policy).  Further, under both New York and Louisiana law, the words

and phrases used in an insurance policy are to be construed using their plain, ordinary, and

generally prevailing meaning.  *Compare* La Civ. Code art. 2047 ("The words of a contract must

be given their generally prevailing meaning.") *with State v. Capital Mut. Ins. Co.*, 623 N.Y.S.2d

660, 661 (N.Y. App. 3d Dept. 1995) ("[T]his court, in the interpretation of an insurance contract,

will give plain and ordinary meaning to clear and unambiguous language.").  Neither forum

permits courts to interpret an insurance policy in a manner that would threaten to modify what is

reasonably contemplated by the policy's unambiguous terms.  *Compare* La. Civ. Code art. 2046

("When the words of a contract are clear and explicit and lead to no absurd consequences, no

further interpretation may be made in search of the parties' intent.") *with World Trade Ctr.*

*Props.*, 345 F.3d at 184 (explaining that, under New York law, courts must avoid interpreting insurance policies in such a way as to lead to absurd results).

Both Louisiana and New York require that, where possible, a contract provision "susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." *Compare* La. Civ. Code. art. 2049 (quoted above) *with International Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) (explaining that New York law disfavors "contract interpretations that render provisions of a contract superfluous"). Accordingly, both forums require that words susceptible of two different meanings should "be interpreted as having the meaning that best conforms to the object of the contract." *Compare* La. Civ. Code. art 2048 (quoted above) *with Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667 (N.Y. 2003) ("A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.").

In addition, under both New York and Louisiana law, a policy provision is ambiguous only if it is "susceptible to two or more reasonable interpretations." *Compare Cadwadaller*, 02-1637, p. 4; 848 So. 2d at 580 (quoted above) *with Compagnie Financiere De Cic et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) (explaining that, under New York law, a contract provision is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement"). Courts of both forums are permitted to interpret ambiguous provisions in light of the custom and usages of the industry, as well as the conduct of the parties and any prior agreements between them. *Compare* La. Civ. Code art. 2053 ("A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the

conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.") *with Morgan Stanley Group, Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (explaining that under New York law, a provision is ambiguous only if a reasonable person "cognizant of the customs, practices, usages and terminology as generally understood in the particular trade" could not ascertain the meaning of the provision, in which case courts may accept extrinsic evidence to determine the parties' intent).  Both forums also provide that, as a last resort, ambiguous terms should be construed against the drafter.  *Compare* La. Civ. Code art. 2056 ("In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.") *with Albany Savings Bank, FSB v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997) (explaining that, under New York law, ambiguous terms should be construed against the drafter "only as a matter of last resort after all aids to construction have been employed without a satisfactory result").

Under both New York and Louisiana law, an insurer seeking "to exclude certain coverage from its policy obligations … must do so in clear and unmistakable language."  *Compare Seaboard Sur. Co. v. Gillette Co.*, 486 N.Y.S.2d 873, 876 (N.Y. 1984) (quoted above) *with Perault v. Time Ins. Co.*, 633 So. 2d 263 (La. App. 1 Cir. 1993) (explaining that, under Louisiana law, coverage exclusions must be written in unambiguous and easily understandable language).  Further, both forums provide that insureds may recover extra-contractual damages for an insurer's bad faith refusal to timely pay or adjust claims.  *Compare Boudreaux v. State Farm Mut. Auto Ins. Co.*, 04-1339, pp. 3-4 (La. App. 4 Cir. 2/2/05); 896 So. 2d 230, 233 (explaining that, under Louisiana law, an insured may recover statutory penalties for an insurer's bad faith failure to timely pay a claim after receiving satisfactory proof of loss when "the failure to pay is arbitrary, capricious, or without probable cause") *with Bi-Economy Market, Inc. v. Harleysville*

*Ins. Co.*, 10 N.Y.3d 187, 195 (N.Y. 2008) ("[I]n light of the nature and purpose of the insurance contract at issue, as well as [plaintiff's] allegations that [defendant] breached its duty to act in good faith, … [plaintiff's] claim for consequential damages, including the demise of its business … was reasonably foreseeable and contemplated by the parties....").

Rainbow argues that the laws of New York and Louisiana differ in several material aspects in the area of contract interpretation. For example, Rainbow contends that Louisiana law is more forgiving of insurers who draft vague or ambiguous exclusions. As noted above, however, Louisiana law, like New York law, requires that insurers write coverage exclusions in clear, unambiguous, and easily understandable language. To the extent that the laws of New York and Louisiana may differ with respect to the determinative issues in this case, the Court finds that these differences are insignificant for purposes of resolving the parties' dispute, and, furthermore, New York's interests will not be compromised by the application of Louisiana law. Accordingly, because the laws of New York and Louisiana are substantially similar with respect to the determinative issues in this case, and because any minor differences between the laws will have no measurable effect on the outcome herein, the Court will apply Louisiana law as the law of the forum state. *See Mumblow v. Monroe Broadcasting, Inc.*, 401 F.3d 616, 620 (5th Cir. 2005) ("Because we conclude that the substantive contract law of New York and Louisiana is in harmony on these issues, no choice of law analysis is necessary, and we apply Louisiana law.").[4]

---

[4] The Court notes, however—as both parties have argued at various stages in their briefing—that Louisiana has a compelling interest in applying its laws to the insurance of properties located within the state and which suffered damage resulting from Hurricane Katrina. Further, Nutmeg's alleged failure to timely adjust the claims also occurred in Louisiana. In the absence of a choice-of-law provision in the policy, the Court finds that Louisiana's interest in applying its laws is persuasive.

**B. WHETHER RAINBOW'S POTENTIAL RECOVERY IS LIMITED BY THE AMOUNTS LISTED IN THE STATEMENT OF VALUES**

Nutmeg first moves for partial summary judgment on the issue of whether the 2004-05 policy limits Rainbow's potential recovery to the values set forth in the Statement of Values filed with Nutmeg. As stated above, the 2004-05 policy provides that Nutmeg "shall not be liable under this Policy for more than its pro rata share, being 100% of the 'ultimate net loss', in excess of the total amount of underlying insurance." (Rec. Doc. 58-2, at FS0000016). The policy defines "Ultimate Net Loss" as follows:

> I. "Ultimate Net Loss", as used herein, means the actual loss or damage sustained by the Named Insured (including any deductible or self-insured retention amount) as a direct result of the perils insured against in this Policy to property covered hereunder arising from any one loss or disaster, after making deductions for salvage and subrogation and recoveries from any source other than this Policy and the underlying insurance and excess insurance policies, but in no event shall the "ultimate net loss" exceed the aggregate amount produced by the lesser of:
>
> > a. the value stated for each individual item on the latest statement of values on file with [Nutmeg], or
> >
> > b. the amount of loss to each individual item on the latest statement of values on file with [Nutmeg]
>
> reduced by any amounts
>
> > c. recoverable from underlying insurance, or
> >
> > d. within applicable deductibles or self-insured retentions.

*Id.* at FS0000017. The policy further provides that, "SUBJECT TO VALUES REPORTED ON SOV. IF NO VALUES REPORTED FOR A CERTAIN COVERAGE THEN THERE WILL BE NO COVERAGE FOR THAT ITEM AT TIME OF LOSS." *Id.* at FS0000022. Nutmeg argues that there are no remaining issues of fact that could have any measurable bearing on the clear and unambiguous language of the policy itself.

In opposition, Rainbow contends that there are genuine issues of material fact as to whether the parties mutually agreed to remove the Statement of Values limitation in the policy prior to Hurricane Katrina, as well as whether Nutmeg may have deleted the limitation when it removed a provision in the contract in late 2006. Rainbow alleges that circumstantial evidence, including, *inter alia*, various communications between Dachs and Hartan, as well as between Hartan and Nutmeg, suggest that the parties did agree to remove the Statement of Values limitation prior to the issuance of the policy. According to Rainbow, the binders and quotes exchanged prior to the issuance of the policy had no binding effect on the parties, who had, as Rainbow contends, already agreed to remove any limitation tying Rainbow's recovery to the amounts listed in the Statement of Values. In addition, Rainbow argues that Nutmeg's decision to retroactively delete the limitation as "redundant" is curious at best and provides still further evidence that the parties intended to delete the provision prior to issuance of the policy. According to Rainbow, Nutmeg's proffered explanation for deleting the provision—that the particular clause at issue was redundant, unnecessary, and confusing—is disingenuous.

Nutmeg, however, contends that it deleted the limitation precisely because the modification did not in any way change the substantive terms of the policy, which, at the time the request was made, had already expired. According to Nutmeg, at least five separate portions of the policy reflect that the maximum recovery afforded to the insured will be limited to the values contained in the Statement of Values, including:

> (1) the ultimate net loss provision;
>
> (2) the coverage provision, which provides states that if the terms of the Nutmeg policy are more restrictive or contrary to the terms of the underlying Crum & Forster policy, the terms of the Nutmeg policy will supersede those of the Crum & Forster policy;
>
> (3) the description and location of property covered;

(4) Item 5 of Endorsement A, which states that it deletes the Values and Margin clauses of the underlying Crum & Forster policy; and

(5) Item 6 of Endorsement A, which provides that if no values are reported for a certain coverage, "then there will be no coverage for that item at time of loss."

As a result, Nutmeg contends that the post-expiration deletion not only did not alter the terms of the policy, but it also does not support any inference that the parties agreed to remove the limitation prior to the issuance of the policy.

As an initial matter, the Court notes that Mr. Silba of Hartan was not an agent of Nutmeg and therefore did not have authority to bind Nutmeg to any particular policy or provision. As the Fifth Circuit has explained, under Louisiana law,

[a] broker who solicits business for more than one insurer, who has no power to bind the insurer without permission, or who is asked by the client to procure coverage wherever possible at the best price, is not an agent of the insurer, even if he uses application forms or advertising decals with the insurer's name.

*Motors Ins. Co. v. Bud's Boat Rental, Inc.*, 917 F.2d 199, 204 (5th Cir. 1990). It is therefore of no consequence whether Mr. Silba consented to Mr. Dachs' request to remove the Statement of Values limitation either prior to or following the issuance of the Nutmeg 2004-05 policy. Instead, the Court will look to see whether there is any evidence to suggest that Nutmeg ever received or consented to such a request.

"When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. In the absence of fraud, an insurance policy may be reformed in limited circumstances if, through mutual error, the policy as issued does not reflect the intent of the parties. *Samuels v. State Farm Mut. Auto. Ins. Co.*, 06-0034, pp. 6-7 (La. 10/17/06); 939 So. 2d 1235, 1240. When an insured seeks to prove that the parties intended to insure a substantially different risk from

that expressed in the written policy, however, the insurer must prove the mutual mistake by clear and convincing evidence.  *Id.*[5]

Even if the Court accepts Rainbow's argument that the parties were not bound by any of the terms or provisions contained in the various binders and quote letters exchanged prior to the issuance of the policy, the parties were nevertheless bound by the terms of the policy itself, which, in the context of the Statement of Values, are clear and unambiguous.  Rainbow argues that there are genuine issues of material fact as to whether the parties agreed to remove the limitation prior to the issuance of the policy.  Apart from the July 2006 request, however, there is no evidence that Nutmeg ever agreed to delete the Statement of Values limitation from the 2004-05 policy—let alone that Nutmeg even received notice of such a request.  Further, Rainbow's contention that Nutmeg deleted the limitation by removing a single clause from the policy is similarly unsupported by the evidence.  Ms. Torgerson testified that Nutmeg removed the provision as redundant and unnecessary.  Prior to deleting the clause, Ms. Torgerson explained that the deletion did not substantially alter the terms of the policy, as the provision had been mistakenly included in the policy.  Rainbow has offered no credible evidence to refute that explanation.

It may well be that Rainbow, Dachs, and even Hartan sought to remove the Statement of Values limitation prior to—or even after—renewing the Nutmeg policy.  It is clear from the evidence and the actual language of the policy, however, that they did not do so, and there is nothing to suggest that Nutmeg ever received such a request.  As a result, Rainbow is left to argue that the Court should look beyond not only the binders and quote letters exchanged by the

---

[5] There is some issue as to whether Rainbow may assert reformation as a basis for opposing summary judgment, as Rainbow has not filed a reformation claim and the deadline for amending pleadings has expired.  For purposes of this motion, however, the Court will assume that Rainbow may base its defense on a potential claim for reformation of the contract.

parties prior to the issuance of the policy, but also beyond even the terms of the policy itself, to create an issue of fact that finds no support in any meaningful evidence. Rainbow's argument never rises above the level of mere speculation and is thus insufficient to defeat Nutmeg's well-founded motion for summary judgment on this point. Accordingly, the Court finds that Nutmeg is entitled to summary judgment as to this issue, and Rainbow's recovery is therefore limited to the amounts listed in the Statement of Values on file with Nutmeg, pursuant to the clear and unambiguous terms of the policy.

### C. WHETHER THE TERM "SUB ZONES" CONTAINED IN THE NUTMEG POLICY FLOOD EXCLUSION PRECLUDES COVERAGE TO ANY OF RAINBOW'S COMMERCIAL PROPERTIES

Second, both parties have moved for partial summary judgment regarding the meaning of the term "sub zones" as that term is used in the flood exclusion of the Nutmeg excess level policy. Nutmeg seeks judgment as a matter of law that the term "sub zones," as it is used in the policy, refers to all properties located within any flood zone beginning with letters "A" or "V," such as, for example, zones A1 through A30. In opposition, Rainbow seeks a ruling that the term is ambiguous and/or meaningless in the context of the 2004-05 Nutmeg policy. Rainbow contends that, because the term is meaningless, it does not preclude coverage to any of the properties at issue in this case, many of which are located in zones beginning with the letters "A" or "V" but not specifically located in either Zone A or Zone V.

The relevant policy provision states in pertinent part:

> ITEM 9.D. PERILS EXCLUDED.
> ITEM P. & Q. ARE ADDED AS FOLLOWS:
> P. EARTHQUAKE IN THE STATE OF CALIFORNIA
> Q. FLOOD IN FLOOD FEMA ZONE A & V AND ANY SUB ZONES
> THEREOF.

(*See* Rec. Doc. 58-2, at FS0000021). According to Nutmeg, even if the Court were to find the term "sub-zones" vague, the meaning of the term could readily be ascertained by the custom of the parties entering into these negotiations. Nutmeg further contends that it is common for insurers to refer to only the first letter of a flood zone, as opposed to setting out in detail the full range of zones excluded from coverage. Finally, Nutmeg argues that the history of the NFIP shows that the term "sub zones" likely refers to any zones beginning with the letters "A" or "V," despite evidence that neither FEMA nor the NFIP use the term themselves.

In opposition, as well as in support of its own motion for partial summary judgment, Rainbow counters that the term "sub zones," as it is used in the policy, is meaningless and cannot be saved by any prior policies between the parties. According to Rainbow, not only is there no such thing as a "sub zone," but the term is unique to the 2004-05 policy, as previous Nutmeg policies set forth in detail each of the flood zones excluded from coverage and never used the term "sub zones." For example, Rainbow points to the 2001 and 2002 Nutmeg policies, which state:

> This company shall not be liable for flood at any location wholly or partially located within the 100 year flood plain as determined by the Federal Emergency Administration (FEMA). The 100 year flood plain is indicated on the flood insurance maps or flood hazard maps as zones A or V or any subdivision thereof, to include but not limited to zones AO, AH, AE, A99, A1 through A30, AR, VO, VE, V1 through V30.

(*See* Rec. Docs. 58-7 at FS0001840, 58-9 at FS0001535). When asked why the 2004-05 policy did not similarly set forth in detail the specific zones excluded from coverage, Ms. Torgerson responded that the omission was likely due to a "clerical error." *See* Deposition of Dee Torgerson at p. 107-08. In further support of its argument, Rainbow points to Mr. White's third report, in which Mr. White concedes that the term "sub zones" does not specifically correspond

to any terms used by FEMA or the NFIP, but instead appears to be unique to the Nutmeg policy. (Rec. Doc. 75-D).

Under the Louisiana Civil Code, "[a] doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ. Code art. 2053. Although it is true that previous Nutmeg policies expressly excluded coverage for properties located in any flood zones beginning with the letters "A" or "V," it is also true that the 2001 and 2002 Nutmeg policies used much clearer and more explicit language to specify the particular flood zones subject to exclusion. Further, it does not appear that the 2003 Nutmeg policy contained any comparable language and apparently did not refer to Zones A or V at all. Because the Court finds that the there are genuine issues of material fact as to the meaning of the term "sub zones" as it is used in the policy, as well as the parties' intent in adopting the term, the Court finds that summary judgment as to this issue is inappropriate at this time. Accordingly, the Court will deny both motions for partial summary judgment as to this issue.

### D. WHETHER RAINBOW IS ENTITLED TO STATUTORY BAD FAITH PENALTIES UNDER LOUISIANA REVISED STATUTES § 22:1892 AND § 22:1973

Third, Nutmeg seeks summary judgment as to the issue of statutory penalties. According to Nutmeg, the company should not be subject to statutory penalties, as it had a reasonable, rational, and legally supported basis for the position that it took with respect to whether Rainbow is entitled to coverage under the policy. In opposition, Rainbow counters that any determination as to whether Nutmeg acted in bad faith involves significant factual questions and is therefore inappropriate for summary judgment.

Louisiana law provides that statutory penalties may be assessed against insurers in certain situations for failure to timely resolve claims or pay settlement awards. For example, Louisiana Revised Statute § 22:1892 provides that failure to timely pay or attempt to settle a claim in certain circumstances shall subject the insurer to a penalty "when such failure is found to be arbitrary, capricious, or without probable cause." LA. REV. STAT. ANN. § 22:1892(B)(1) (previously cited as LA. REV. STAT. ANN. § 22:658).[6] Similarly, Louisiana Revised Statute § 22:1973 sets forth that an insurer that breaches its "duty of good faith and fair dealing" to the insured shall be subject to statutory penalties. LA. REV. STAT. ANN. § 22:1973 (previously cited as LA. REV. STAT. ANN. § 12:1220).[7]

Under Louisiana law, the determination of whether an insurer acted arbitrarily, capriciously, or without probable cause in failing to timely respond to an insured's proof of loss necessarily depends on the facts of each individual case. *See Roberie v. S. Farm Bureau Cas. Ins. Co.,* 194 So.2d 713, 716 (La. 1967) ("A determination as to what constitutes bad faith or lack of good faith depends on the facts and circumstances of each case."); *see also Combetta v. Ordoyne,* 04-2347, pp. 8-11 (La. App. 1 Cir. 5/5/06); 934 So.2d 836, 842-43 ("In order to determine whether or not an insurer acted reasonably and in good faith in negotiating and settling a claim, one must look to the facts of the individual case."). Moreover, in bad faith actions against an insurer, the insured bears a considerable burden because "the insured is seeking extra-contractual damages, as well as punitive damages." *See Lewis v. State Farm Ins. Co.,* 41-527, p. 25 (La. App. 2 Cir. 12/27/06); 946 So.2d 708, 725. In order to show that the insurer acted arbitrarily, capriciously, or without probable cause, the insured must demonstrate that the

---

[6] La. Rev. Stat. Ann. § 22:658 was renumbered to La. Rev. Stat. Ann. § 22:1892 by Acts 2008, No. 415, § 1, effective January 1, 2009. The parties' briefing, which was submitted prior to the renumbering, refers to the statute as § 22:658. For clarity, however, the Court will refer to the statute under its current title.

[7] La. Rev. Stat. Ann. § 22:1220 was renumbered to La. Rev. Stat. Ann. § 22:1973 by Acts 2008, No. 415, § 1, effective January 1, 2009. The parties' briefing, which was submitted prior to the renumbering, refers to the statute as § 22:1220. For clarity, however, the Court will refer to the statute under its current title.

"insurer knowingly committed actions which were completely unjustified, without reasonable or probable cause or excuse." *See Holt v. Aetna Cas. & Sur. Co.,* 28450-CA, p. 18 (La. App. 2 Cir. 9/3/96); 680 So.2d 117, 130. "Bad faith," as that term is contemplated in the jurisprudence, means "more than just bad judgment or negligence; it implies a dishonest purpose or evil intent." *See Combetta*, 934 So. 2d at 843. An insurer that has a reasonable basis for denying coverage or reasonable doubts as to whether coverage applies does not act in bad faith; indeed, such an insurer "has the right to litigate … questionable claims without being subjected to damages and penalties." *Clark v. McNabb*, 04-0005, p. 10 (La. App. 3 Cir. 5/19/04); 878 So. 2d 677, 684.

Turning to the instant case, the Court finds that, at this time, Nutmeg is entitled to summary judgment to the limited extent that Rainbow seeks penalties for Nutmeg's decision not to pay damages in excess of the amounts listed on the Statement of Values. It is not clear from the parties' briefing, however, what effect the Statement of Values limitation may have on Rainbow's remaining claims, if indeed there are any. Further, it is also not clear whether Nutmeg concedes that there are certain losses that are recoverable under the policy, and, if so, whether Nutmeg has in good faith already compensated Rainbow for those losses. As a result, the Court finds that there are genuine issues of material fact as to whether Rainbow might be entitled to statutory bad faith penalties for any claims not already precluded by the Statement of Values limitation. To the extent that Rainbow seeks statutory penalties for Nutmeg's refusal to pay in excess of the amounts listed on the Statement of Values, however, Nutmeg's motion is granted, reserving to Nutmeg the right to refile its motion as to any remaining claims at a later date if future discovery eliminates factual disputes.

**E.  WHETHER THE NUTMEG 2004-05 POLICY LIMITS RAINBOW'S
   BUSINESS INTERRUPTION LOSSES TO ACTUAL LOSSES SUSTAINED**

Rainbow moves for partial summary judgment as to the issue of business interruption

losses.  According to Rainbow, its business interruption losses should be calculated pursuant to

the terms of the underlying Crum & Forster policy, as the excess level Nutmeg policy follows

the form of the underlying policy and does not expressly modify any of the underlying business

interruption provisions.  In response, Nutmeg contends that it only provided business interruption

coverage to Rainbow on an "actual loss sustained" basis.  According to Nutmeg, although the

primary Crum & Forster policy provided that Rainbow's business interruption losses would be

calculated by determining the total income lost for each individual store without any credit for

the sales of Rainbow's other stores in similar or adjoining areas, the "actual loss sustained" terms

in the Nutmeg policy modified the underlying policy to provide for such a credit.

As stated above, the 2004-05 Nutmeg policy follows the form of the underlying Crum &

Forster policy, except for certain limitations or exclusions modifying the terms for purposes of

the excess level policy.  Specifically, the Coverage section of the Nutmeg policy states:

> E. COVERAGE
>
> This Policy insures against loss or damage as per terms and conditions of the
> "Leading Underlying Insurance Policy" listed in Section F., except that where the
> provisions and stipulations provided for herein are more restrictive or contrary to
> those of the "Leading Underlying Insurance Policy," [this] Policy shall supersede.

(Rec. Doc. 58-2 at FS0000018).  Rainbow contends that, because the Nutmeg policy does not

expressly modify the terms by which the underlying Crum & Forster policy defines business

interruption losses, Rainbow's business interruption losses should be calculated pursuant to the

terms of the underlying policy.  In support of its argument, Rainbow argues that the Nutmeg

policy does not contain any specific reference to business interruption losses or, for that matter, any methodology by which such losses could be calculated.

In response, Nutmeg contends that, unlike the Crum & Forster policy, the excess level policy expressly provides that business interruption losses shall be determined based on an "actual loss sustained" standard. According to Nutmeg, the 2004-05 policy definition of the term "ultimate net loss" departs from the form of the underlying policy with respect to all losses, including, *inter alia*, business interruption losses:

> "Ultimate Net Loss", as used herein, means *the actual loss or damage sustained* by the Named Insured (including any deductible or self-insured retention amount) as a direct result of the perils insured against in this Policy to property covered hereunder arising from any one loss or disaster….

*Id.* at FS0000017. Although the above provision does not expressly reference business interruption losses, Nutmeg contends that the term "actual loss sustained" is a term used exclusively in business interruption policies and applies only to business interruption losses. *See, e.g.*, COUCH ON INSURANCE § 185:7 (3d ed. 2008) ("A business interruption policy ordinarily limits the recovery to actual loss for such length of time as it would take to repair or replace the building in which the business is conducted."). Moreover, Nutmeg argues that it did not need to provide a specific definition or explanation as to how business interruption losses would be calculated under the policy because there is no prescribed formula for the determination of the actual loss of a business income and expenses.

After reviewing the relevant law, the parties' briefing, and the policy documents, the Court finds that there are genuine issues of material fact as to whether the excess level policy provides coverage for business interruption losses on anything other than an "actual loss sustained" basis. Although it is true that the 2004-05 Nutmeg policy does not expressly limit business interruption losses by name, the policy clearly states that Rainbow's "ultimate net loss"

under the policy will be limited to "the actual loss or damage sustained…."  According to

Rainbow, the Court should find as a matter of law that the Nutmeg policy allows business

interruption losses to be calculated differently from other losses.  The argument is not persuasive.

Accordingly, the Court finds that there are genuine issues of material fact as to the effect of the

"ultimate net loss" provision on Rainbow's potential recovery of business interruption losses and

therefore summary judgment is inappropriate as to this issue.[8]

## IV.    CONCLUSION

For the foregoing reasons, IT IS ORDERED that Nutmeg's Motion for Partial Summary

Judgment is GRANTED IN PART AND DENIED IN PART and Rainbow's Cross Motion for

Partial Summary Judgment is DENIED.

New Orleans, Louisiana, this 3rd day of March, 2009.

UNITED STATES DISTRICT JUDGE

---

[8] In reaching this conclusion, the Court need not consider the contents of the several quote letters and binders exchanged by the parties prior to the issuance of the 2004-05 policy.  The Court notes, however, that, to whatever limited extent these materials may be relevant, if at all, they further support a finding that summary judgment is inappropriate as to this issue.  For example, Ms. Torgerson's quote letter, which was forwarded to Dachs by Hartan, states: "Valuation: Replacement cost, if replaced, otherwise ACV, Actual Loss sustained as respects business interruption."  (*See*  Rec. Docs. 58-15, 16, 17, 18).