# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RAINBOW USA, INC., ET AL.** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 06-4578** |
| **CRUM & FORSTER SPECIALTY INSURANCE COMPANY, ET AL.** | * | **SECTION: "L" (1)** |

## ORDER & REASONS

Currently pending before the Court are Plaintiff Rainbow USA, Inc.'s Motion for Summary Judgment (Rec. Doc. 127) and Defendant Nutmeg Insurance Company's Motion for Summary Judgment (Rec. Doc. 129). The primary issue before the Court for resolution in these motions is how the "ultimate net loss" provision in Plaintiff's insurance policy is to be applied. These motions came on for oral argument on February 24, 2010. At that hearing, the Court ruled that the provision is ambiguous. The Court also indicated that it would defer ruling on the motions to allow the parties to submit supplemental briefing regarding whether there was enough extrinsic evidence in support of Defendant's interpretation to send the question to the jury, or whether the Court should simply interpret the provision against the drafter, Nutmeg. On April 21, 2010, the Court heard oral argument on this issue and took both motions under submission. At this time, the Court has considered the evidence, briefing, and argument provided by the parties. For the following reasons, both motions are DENIED.

## I. BACKGROUND

This case arises out of insurance claims regarding several commercial properties owned

or leased by the Plaintiff, Rainbow USA, Inc. ("Rainbow").  Rainbow, a New York corporation with its primary place of business in New York, is engaged in the retail clothing business. Rainbow and its subsidiaries owned or leased certain commercial properties in Louisiana and Mississippi that suffered damage resulting from Hurricane Katrina.

Rainbow obtained both an underlying insurance policy and an excess level policy for certain of its commercial properties over the relevant period of September 1, 2004, through September 1, 2005.  Crum & Forster issued the underlying insurance policy, which provides certain coverage up to $10 million per occurrence; the Defendant, Nutmeg Insurance Company ("Nutmeg"),[1] issued the excess level policy, which provides certain coverage up to $40 million above the initial $10 million provided for by the underlying policy.  In August 2005, Hurricane Katrina inflicted significant damage on certain of Rainbow's commercial properties.  Crum & Forster, the primary level insurer, has agreed to pay or has paid up to the limits of the primary policy for damages to the properties as well as Rainbow's subsequent loss of business income. Nutmeg, the excess level insurer, contends that certain damages and business interruption losses claimed by Rainbow above the limits of the primary policy are excluded under the terms and conditions of the excess level policy.

## A.     The 2004-05 nutmeg policy

Before addressing the substance of the parties' arguments, it is appropriate to provide a brief overview of the complex relationship between Rainbow and Nutmeg.  Through a series of retail brokers, wholesale brokers, and insurance underwriters, Rainbow has purchased annual excess level insurance policies from Nutmeg every year since 1998.  Dachs & Sons, Inc.,

---

[1] Nutmeg is a Connecticut corporation with its primary place of business in Hartford, Connecticut.

("Dachs") is a retail broker that regularly obtains property insurance for Rainbow, including the policy at issue in this case. Harvey Dachs is the president, CEO, and sole stockholder of Dachs. Hartan Brokerage, Inc., ("Hartan") is a wholesale broker that acts as an intermediary between insurance companies such as Nutmeg and retail brokers such as Dachs. Joe Silba, a Hartan employee, assisted in negotiating the renewal of the Nutmeg 2004-05 policy at issue in this litigation. First State Specialty Property ("First State"), an underwriting facility for The Hartford, underwrites insurance policies issued by, among other companies, Nutmeg, which is itself a subsidiary of The Hartford. Dee Torgerson, an Executive Underwriter for First State, assisted in preparing the Nutmeg policy at issue in this case, as well as previous excess level policies issued to Rainbow.

The 2004-05 Nutmeg policy is an excess level policy that insures Rainbow for "all risks of direct physical loss or damage to covered property except as excluded" by certain conditions. As the excess level policy, the Nutmeg policy follows the form of the underlying Crum & Forster policy, adopting the terms and conditions of the underlying policy subject to certain additional exclusions and modifications. (*See* Rec. Doc. 58-2, at FS0000018). Pursuant to the terms of the excess level policy, Nutmeg would not be liable "for more than its pro rata share, being 100% of the 'ultimate net loss', in excess of the total amount of underlying insurance." *Id.* at FS0000016. The policy further required that any change to the policy be made by endorsement issued by Nutmeg. *Id.* at FS0000014, FS0000019.

From 1998 through the 2004-05 policy, every excess policy issued by Nutmeg contained, *inter alia*, the following similar provisions: (1) an Occurrence Limit of Liability endorsement, which, according to Nutmeg, differed from the terms of the underlying Crum & Forster policies in

that it limited the annual aggregate loss for all occurrences, regardless of the number of occurrences, to $40 million; and (2) the following "Ultimate Net Loss" provision:

> I. "Ultimate Net Loss", as used herein, means the actual loss or damage sustained by the Named Insured (including any deductible or self-insured retention amount) as a direct result of the perils insured against in this Policy to property covered hereunder arising from any one loss or disaster, after making deductions for salvage and subrogation and recoveries from any source other than this Policy and the underlying insurance and excess insurance policies, but in no event shall the "ultimate net loss" exceed the aggregate amount produced by the lesser of:
>
>> a. the value stated for each individual item on the latest statement of values on file with [Nutmeg], or
>>
>> b. the amount of loss to each individual item on the latest statement of values on file with [Nutmeg] reduced by any amounts
>>
>>> a. recoverable from underlying insurance, or
>>>
>>> b. within applicable deductibles or self-insured retentions.

*Id.* at FS0000017. With respect to the values listed in the Statement of Values filed with Nutmeg, the 2004-05 policy further provides that, "SUBJECT TO VALUES REPORTED ON SOV [Statement of Values]. IF NO VALUES REPORTED FOR A CERTAIN COVERAGE THEN THERE WILL BE NO COVERAGE FOR THAT ITEM AT TIME OF LOSS." *Id.* at FS0000022 (bracketed information added for clarity). In contrast, the underlying policies issued by Crum & Forster generally did not contain similar limitations, instead providing that any values listed in the Statement of Values were to be used for premium purposes only.

Finally, the policy included a Margin clause, which provided for a change in premium rates in the event of large changes to the values listed on the statement of values. Specifically, the provision stated:

> Total values as of inception of the policy, being September 1, 2004 are $531,475,000. An additional premium or return premium will apply if the total

4

increase or decrease in value during the policy term exceeds 10% of the values reported at inception. This clause does not apply to newly acquired locations for the peril of Wind in Florida and Puerto Rico and the peril of Earthquake in California, which are subject to the underwriters rating and additional premium charge.

*Id.* at FS0000067.

## B. Communications prior to the issuance of the 2004-05 policy

In August 2004, Harvey Dachs requested that the Nutmeg policy be renewed for the 2004-05 year. Dee Torgerson of First State prepared a quote letter, which included both the Statement of Values limitation and the flood zone exclusion set forth above. In addition, the quote letter also included the following language: "[T]he conditions contained in [this] quote are not necessarily in compliance with the conditions requested in your submission. Furthermore, we are not obligated to provide coverage not addressed in this quote even though it may have been requested in your submission." (*See* Rec. Doc. 58-15, at FS0000099). Joe Silba of Hartan forwarded the quote letter to Mr. Dachs via facsimile. On August 31, 2004, Mr. Dachs sent documentation to Mr. Silba stating, "Renew as expiring. Delete Occurrence Limit of Liability endorsement. Follow form of primary policy of Crum and Forster." (*See* Rec. Doc. 58-14). Mr. Silba received the documentation, signed it the same day, and responded that Hartan binders would follow. *Id.* On the same day that Mr. Silba signed the binders, he also sent an e-mail to Ms. Marge Charpentier, an assistant to Ms. Torgerson, in which he stated that he was "binding as per authorization" and that "Hartan binders to follow." (*See* Rec. Doc. No. 75-V). Nutmeg, however, contends that it did not receive notification of Dachs' request and that, prior to Hurricane Katrina, no one from Rainbow, Dachs, or Hartan ever asked Ms. Torgerson or anyone

else at Nutmeg to issue property insurance that was not limited by the values set forth in the Statement of Values.

Shortly after receiving Mr. Dachs' request, Mr. Silba prepared a binder that contained substantially the same language as set forth in Ms. Torgerson's quote letter—without any reference to the deletion of policy language or conditions, but with the same provision indicating that Nutmeg would not be obligated to provide coverage not addressed in the binder even though it may have been requested in the submission. Mr. Silba forwarded the binder to Mr. Dachs via facsimile on September 7, 2004. On September 9, 2004, Mr. Silba signed and mailed to Mr. Dachs a full copy of the policy binder, which again contained the same language and exclusions as set forth in the quote letter. Several months later, on March 1, 2005, Nutmeg issued the 2004-05 policy.

### C.      Communications following issuance of the 2004-05 policy

On or about April 17, 2005, Mr. Dachs sent Mr. Silba a written request to remove the connection between the dollar amounts contained in the Statement of Values and the limits that Nutmeg would pay for a covered loss. There is no evidence that this request was ever conveyed to Nutmeg, however, and Nutmeg contends that it did not receive any additional communication regarding the policy or its exclusions until Hartan conveyed a request by Mr. Dachs to delete the Occurrence Limit of Liability endorsement on July 28, 2006. After receiving the request, Ms. Torgerson sent an email to Thomas Conboy, her supervisor, stating:

> Tom,
>
>         When we issued this policy form, which was our follow form over C& F primary, we inadvertently added the PE4, Occurrence limit wording. Our follow form includes the ultimate net loss wording, which is the same as the PE4. The underlying policy also includes similar wording. My quote specifically states that we only

provide coverage for locations and values as stated on the SOV. That language was additionally made a part of our policy by endorsement. The broker has requested that we remove the PE4 as it is not necessary and provides confusion as part of the policy. This account was bound 9-1-04. The underlying policy was received 1-18-05 and we issued our follow form on 2-28-05. There was a Katrina loss (first I've heard about it). It may be below the attachment point. I don't believe that a loss on this account was reported to us. The locations have not been repaired and the BI is running up, as I understand it.

I don't believe that removing the PE4 changes the policy, but merely corrects a mistake that was made when issuing the policy.

Please let me know if ok to remove the endorsement.

(*See* Rec. Doc. 58-21).

On July 28, 2006, Ms. Torgerson prepared a facsimile to Vincent Darragh, the Senior Vice President in the Property Division at Hartan, further explaining Nutmeg's decision to delete the Occurrence Limit of Liability endorsement as follows:

Vinny,

Confirming our various conversations, attached please find the endorsement deleting the form PE4 [Occurrence Limit of Liability endorsement]. This is a redundant endorsement as similar language is contained in the excess follow form as well as the underlying primary policy.

The deletion of this form in no way changes the underwriter's intent, nor the terms and conditions outlined in the quote letter and under which this account was bound. Deletion of the PE4 is merely a correction to an oversight that was made when the policy was issued.

Also, per your request, we have included a copy of the Crum and Forster underlying policy form that was provided to us by your office. This form was used as the underlying coverage we followed, subject to the terms and conditions as set forth in our policy. We have not received any changes or endorsements to this policy form issued by C&F since its inception.

(*See* Rec. Doc. 58-20).

Ms. Andrea Matott was the Nutmeg claim adjustor who handled Rainbow's Hurricane Katrina claims. In addition to assigning Ms. Matott to adjust the claims, Nutmeg also retained Douglas White, an outside adjuster from the firm of White – Hart & Associates, to conduct an

investigation into the condition of the properties. On August 21, 2006, Mr. White sent a Reservation of Rights letter to Rainbow listing several potential coverage defenses, including the flood exclusion. The letter did not comment on the Ultimate Net Loss provision or the methodology by which Nutmeg would calculate business interruption losses, but rather reserved Nutmeg's rights to defend the claims pursuant to the terms of the policy.

### D. Procedural history

On August 23, 2006, Rainbow filed suit in this Court seeking $2,432,804 for damages to the building structures and improvements to its commercial properties; $2,811,064 for damage and destruction to its retail stock; $695,049 for damage to contents other than stock; and $31,000,000 for business interruption losses. Nutmeg disputes these amounts and contends that Rainbow is attempting to claim damages that are not covered under the excess level policy.

On June 18, 2008, Nutmeg filed a motion for partial summary judgment. On August 5, 2008, Rainbow filed a cross motion to strike and a motion for partial summary judgment. In these motions, the parties disputed whether Rainbow's potential recovery under the excess policy was limited by the value for each individual item as set forth in the Statement of Values filed with Nutmeg. On March 3, 2009, the Court ruled on this issue and stated that "Rainbow's recovery is . . . limited to the amounts listed in the Statement of Values on file with Nutmeg, pursuant to the clear and unambiguous terms of the policy." *Rainbow USA, Inc. v. Nutmeg Ins. Co.*, 612 F. Supp. 2d 716, 730 (E.D. La. 2009). Thus, while the Court held that any limitation imposed by the Statement of Values was clearly and unambiguously applicable under the policy, the Court did not determine how that limitation was to be applied or interpreted based on the language of the policy.

## II.    PRESENT MOTIONS

### A.    Initial Briefing

Both parties have filed motions for summary judgment seeking a determination that their interpretation of the Ultimate Net Loss provision is clearly and unambiguously correct.  The dispute centers around which "individual item[s] on the latest statement of values" should be aggregated when calculating the Ultimate Net Loss.  The latest statement of values on file with Nutmeg contains all of the properties which were covered by the applicable insurance policy. This list spans 18 pages with over 50 properties listed per page.   For most of the properties listed, the statement of values lists separate values for the following categories of loss: 1) building; 2) improvements and betterments; 3) contents; 4) stock; 5) loss of rents; and 6) business interruptions.

According to Nutmeg, only the individual items listed for those 22 properties that were actually damaged in Hurricane Katrina should be aggregated when calculating the Ultimate Net Loss.  In other words, Nutmeg suggests that the proper way to calculate Ultimate Net Loss is to take the values listed for all of the different categories of loss for the 22 properties that were damaged, add up all of these listed values, and arrive at one figure representing the Ultimate Net Loss.  Under this interpretation, Nutmeg argues, the Ultimate Net Loss suffered by Rainbow was $8,097,000.  Accordingly, they assert that the excess policy that Rainbow had in place with them has not been triggered because the policy provides that Nutmeg would not be liable "for more than its pro rata share, being 100% of the 'ultimate net loss', in excess of the total amount of underlying insurance."  The total amount of underlying insurance with Crum & Forster in this case was $10 million, and so if Rainbow's Ultimate Net Loss was only $8,097,000 then it could

not be "in excess of the total amount of underlying insurance."

Rainbow, on the other hand, argues that each discrete category of loss for all of the properties, whether the property suffered a loss during Hurricane Katrina or not, should be aggregated. Under Rainbow's interpretation, the proper way to calculate Ultimate Net Loss is to take all of the values listed in a single category of loss, such as business interruption, for every single property on the statement of values (even those not damaged in the hurricane), and come up with an Ultimate Net Loss for business interruption. It would then be necessary to perform the same calculations for each of the other categories of loss, including building, improvements and betterments, contents, stock, and loss of rents. Thus, the calculation would yield six different Ultimate Net Loss values. According to Rainbow, this would yield a business interruption Ultimate Net Loss of $137,436,000. The actual amount of loss to each individual item on the latest statement of values, Rainbow suggests, is $31,997,315.73.[2] According to the policy, Rainbow's recovery would be limited to the lesser of these values, which, in this case, would be the actual loss.

**B.      Supplemental Briefing**

In their supplemental memo, Nutmeg re-urges the Court to hold that the policy language is clear and unambiguous. But, in the alternative, Nutmeg points out certain extrinsic evidence that they feel at least creates a question of fact to be decided by the jury. This extrinsic evidence includes the language contained within the other insurance policies procured by Rainbow, including their primary policy and their second layer excess policy. Nutmeg also points out that when their underwriter agreed to delete the Occurrence Limit of Liability in the Rainbow policy,

---

[2]The parties have agreed to postpone discovery regarding the actual losses suffered by Rainbow until after the Court has resolved the issues of contract interpretation.

she noted that similar language was contained in the underlying primary policy. Additionally Nutmeg points to the deposition testimony of the underwriter and of Mr. Vincent Darragh, an employee of Hartan. Nutmeg also argues that the Margin clause in the policy further supports their interpretation. Finally, they claim that customs and usage in the insurance industry support their interpretation.

Rainbow has responded and they argue that the evidence cited by Nutmeg is insufficient to send this issue to a jury. According to Rainbow, the language contained in the primary policy and in the second layer excess policy do not shed any light on how the language of this policy is to be interpreted. They argue that the deposition of Nutmeg's underwriter, Ms. Torgerson, reveals that she did not understand how the Ultimate Net Loss provision applied and thus does not create an issue of fact. They also claim that the deposition testimony of Mr. Darragh is irrelevant because he is not employed by either of the parties to this case and his testimony merely makes clear that the Ultimate Net Loss provision does apply, an issue which this Court has already determined, and not how it applies. They also assert that the margin clause and the customs and practices to which Nutmeg refers are only evidence that the Ultimate Net Loss provision does apply, an issue which this Court has already determined, and not how it applies.

## III.     LAW & ANALYSIS

### A.     Standard of Review

Summary judgment is appropriate in a case if "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). "The moving party bears the burden of demonstrating that there exists no genuine issue of material fact." *McCall v. Focus Worldwide Television Network, Inc.*, No. 07-5447, 2008 WL 3366080, *3 (E.D. La. Aug. 8, 2008). A fact is material if it "might affect the

outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In determining whether a genuine issue of material fact exists, the Court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 137 (5th Cir. 2004). Because "only those disputes over facts that might affect the outcome of the lawsuit under governing substantive law will preclude summary judgment," however, questions that are unnecessary to the resolution of a particular issue "will not be counted." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987). Conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a properly supported motion for summary judgment. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). "[S]ummary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075-76 (5th Cir. 1994).

**B.        General summary of Louisiana contract law**

This Court has already held that it will apply Louisiana law to this case. *Rainbow USA, Inc. v. Nutmeg Ins. Co.*, 612 F. Supp. 2d 716, 725 (E.D. La. 2009). Under Louisiana law, insurance policies must be interpreted in accordance with the rules for interpreting contracts in general. *Cadwallader v. Allstate Ins. Co.*, 02-1637, p. 3 (La. 6/27/03); 848 So. 2d 577, 580 ("An insurance policy is a contract between the parties and should be construed using the general rules of interpretation set forth in the Louisiana Civil Code."). Additionally, the words and phrases used in an insurance policy are to be construed using their plain, ordinary, and generally

prevailing meaning.  La Civ. Code art. 2047 ("The words of a contract must be given their generally prevailing meaning.").  Courts applying Louisiana law are not permitted to interpret an insurance policy in a manner that would threaten to modify what is reasonably contemplated by the policy's unambiguous terms.  La. Civ. Code art. 2046 ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.").

However, Louisiana law recognizes that a policy provision is ambiguous only if it is "susceptible to two or more reasonable interpretations."  *Cadwadaller*, 02-1637, p. 4; 848 So. 2d at 580.  Where possible, a contract provision "susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code. art. 2049.  Accordingly, Louisiana law requires that words susceptible of two different meanings should "be interpreted as having the meaning that best conforms to the object of the contract."  La. Civ. Code. art 2048.  Where a contract provision is ambiguous, Courts are permitted to interpret it in light of the custom and usages of the industry, as well as the conduct of the parties and any prior agreements between them.  La. Civ. Code art. 2053 ("A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.").  As a last resort, ambiguous terms should be construed against the drafter.  La. Civ. Code art. 2056 ("In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.").

## C.       The meaning of the Ultimate Net Loss Provision is ambiguous and should be decided by a jury

Each party in this case launches numerous attacks on the soundness of the other party's

interpretation. These attacks will be addressed in turn. Ultimately, the Court is not persuaded that either interpretation is clearly and unambiguously supported by the language of the policy. However, Nutmeg has presented enough evidence to warrant a jury determination regarding the interpretation of the provision. Accordingly, the Court will not construe the provision against the drafter at this time.

<strong>i.        The policy language is inconclusive</strong>

Each party asserts that the language of the policy clearly and unambiguously supports their interpretation. However, neither cites to any case law that is directly on point with the provision at issue. Rainbow asserts that the word "aggregate" in the provision leads to the conclusion that all properties should be included in the Ultimate Net Loss calculation, whether they were damaged in the hurricane or not. They claim that Nutmeg's interpretation of the provision renders the term "aggregate" meaningless. Additionally, they argue that if Nutmeg had wished to limit the Ultimate Net Loss calculation to only those properties that were actually damaged, they could have done so with specific language.

In response, Nutmeg asserts that the policy is clear that only those properties that sustained a loss should be included because it states that "'Ultimate Net Loss', as used herein, means the actual loss or damage sustained by [Rainbow]." Additionally, they point out that the policy references "each individual item on the latest statement of values." Thus, they argue that each property should be considered individually. Furthermore, they point to the other provisions in the policy that support their reading. Specifically, they point out that the policy provides that coverage is "SUBJECT TO VALUES REPORTED ON SOV. IF NO VALUES REPORTED FOR A CERTAIN COVERAGE THEN THERE WILL BE NO COVERAGE FOR THAT ITEM

AT TIME OF LOSS." *Id.* at FS0000022. Additionally, the COMMERCIAL PROPERTY

SUPPLEMENTAL DECLARATIONS define the "property covered hereunder" as "PER

STATEMENT OF VALUES ON FILE WITH THE COMPANY. *Id.* at FS0000011. Finally,

they point out that the Nutmeg policy deleted the Values clause in the underlying Crum & Forster

policy which declared that the values listed in the statement of values "are for premium purposes

only and shall not limit the coverages provided by this policy." *Id.* at FS0000021.

Considering the language contained within the totality of the policy, each side can point to

language that lends support to their position. The provision could certainly have been tailored

more narrowly if "aggregate" had been omitted or if other limiting language had been inserted.

However, Rainbow is incorrect to say that Nutmeg's interpretation renders the word "aggregate"

meaningless because their interpretation would have the Court aggregate the stated values for all

of the categories of loss for a given property. Likewise Nutmeg is incorrect to assert that the

other provisions cited conclusively support their position. While these provisions all serve to

make it clear that the statement of values applies to limit Plaintiff's potential recovery in some

way, they do not unambiguously specify how to apply that provision. Furthermore, the policy

language that reads "'Ultimate Net Loss', as used herein, means the actual loss or damage

sustained by [Rainbow]" is not conclusive. Under Rainbow's interpretation of the Ultimate Net

Loss provision, the Ultimate Net Loss would equal the actual loss or damage that they are

claiming in this case because that amount is less than the amount listed on the statement of values.

Thus, the policy language is not inconsistent with Rainbow's interpretation. Therefore, the

language of the policy on its own is not conclusive in either direction and is ambiguous.

### ii) It is unclear whether the policy is a scheduled policy or a blanket policy

The parties dispute whether the excess insurance policy issued by Nutmeg is a blanket policy or a scheduled policy. A scheduled policy is one in which "each separately treated item of property is in effect covered by a separate contract of insurance and the amount recoverable with respect to a loss affecting such property is determined independently of the other items of property." 12 Couch on Ins. § 175.90. A blanket policy, on the other hand, is one in which coverage "attaches to, and covers to its full amount, every item of property described in it." *Id.* § 177.72. Accordingly, Rainbow's interpretation of the Ultimate Net Loss provision would be bolstered by a finding that the policy was a blanket policy, while Nutmeg argues that the policy is a scheduled policy.

Generally, courts look at the language of an insurance policy as a whole to determine whether it provides for scheduled or blanket coverage. *See generally Axis Specialty Ins. Corp. v. Simborg Dev.*, Case No. 07-C-5906, 2009 WL 765298 (N.D. Ill. March 20, 2009). Although the parties cite to several cases in support of their respective positions, it does not appear that any of these cases are directly on point. No Court has previously interpreted the Ultimate Net Loss provision as it appears in the instant policy.

In *Axis*, the Court held that the following provision unambiguously provided a scheduled coverage:

1. In the event of a loss hereunder, liability of the Company shall be limited to the least of the following:

    A. The actual adjusted amount of loss, less applicable deductible(s) or self-insured retention;

    B. 100% of the individually stated value for each scheduled item of

> property, time element, or other coverages shown on the latest Application
> or Statement of Values on file with the Company, less applicable
> deductible(s) or self-insured retention(s) . . .

*Id.* at *3-4. In reaching their holding, the Court focused on the presence of the word "each" in the

policy and the fact that it contained language that specifically mentioned the "individually stated

value for each scheduled item of property." This policy language, although similar to the

language at issue in Nutmeg's policy, has several significant differences. First, the Nutmeg

policy contains the word "aggregate," which could reasonably suggest that inclusion of all items

on the statement of values is appropriate. Furthermore, the Nutmeg policy does not include the

word "scheduled," which would specifically suggest scheduled coverage.

Similarly, in *Fair Grounds Corp. v.Allianz Underwriters Insurance Co.*, the Court

concluded that "[t]here is no question here that the insurance contract at issue is a 'scheduled'

rather than a 'blanket' policy." 99-301, p. 8 (La. App. 5 Cir. 9/28/99); 742 So. 2d 1069, 1073.

The limitation provision at issue read:

> 2. The premium for this policy is based upon the statement of values on file with
> the company or attached to this policy. In the event of loss hereunder, liability for
> the company shall be limited to the least of the following:
>
> > (B) The total stated value for the property involved as shown on the latest
> > statement of values on file with the company, less applicable deductable(s).

*Id.* at 3; 742 So. 2d at 1071. This provision is clearly more narrowly tailored than the Nutmeg

provision in this case. It contained specific language that limited the statement of values

calculation to the "property involved."

On other hand, courts considering more broadly drafted language have found the

applicable provisions to be ambiguous. *Berkshire Refrigerated Warehousing LLC v. Commercial

Underwriters Ins. Co.*, Case No. 05-C-1953, 2006 WL 862877, at *3 (N.D. Ill. March 27, 2006).

In *Berkshire*, the Court considered a policy that read:

>  1.  The limit or Amount of Insurance shown on the face of this policy or endorsed onto this policy, is the total limit of the Company's liability applicable to each occurrence, as hereinafter defined . . . .
>
>  2.  The premium for this policy is based upon the Statement of Values on file with the Company, or attached to this policy.  In the event of loss hereunder, liability of the Company, subject to the terms of paragraph one (1) above, shall be limited to the least of the following:
>
>>  a.  The actual adjusted amount of loss, less applicable deductible(s).
>>
>>  b.  The total stated value for the property involved, as shown on the latest Statement of Values on file with the Company, less applicable deductible(s).
>>
>>  c.  The limit of Liability or Amount of Insurance shown on the face of this policy or endorsed onto the policy.

*Id.* at *2.  The statement of values in *Berkshire* was similar to the one at issue in this case and had a number of properties listed and the value of each property was broken down into separate categories of loss.  *Id.*  The Court, in concluding it was unclear how to calculate "the total stated value for the property involved," noted that the word "total" did not appear anywhere in the statement of values.  *Id.*  Additionally, the Court stated that "[t]he use of the word 'total' suggests that the term contemplates reference to a sum of more than one 'stated value,' which leads one to the only 'totals' listed in the Statement of Values - either the 'total location value' at the end of each row or the 'total' at the bottom of each column."  *Id.*  Because the Court could not determine which reading was correct, it construed the policy in favor of coverage.  *Id.* at *3.

Similarly, in this case, the policy used the word "aggregate" which suggests that a total must be calculated.  The parties dispute which total is appropriate, and, like in *Berkshire*, it is unclear which total should be used.  Further, the language used in the Nutmeg provision is even

more broad then the language in *Berkshire* because it does limit the calculation to the "property involved." Thus, it appears that the language in this case in ambiguous.

### iii) Both suggested interpretations could lead to absurd results

Either interpretation could lead to somewhat absurd results. First, under Rainbow's interpretation, the limitation imposed by the statement of values would almost never come into play. The value stated for each individual item on the latest statement of values on file would always be a huge number, as is the business interruption Ultimate Net Loss of $137,436,000 in this case. Accordingly, it would almost always exceed the amount of loss to each individual item on the latest statement of values on file and the statement of values would not really act as a limitation at all.

On the other hand, under the Defendant's interpretation of the provision, the excess insurance policy would almost never be triggered. Hurricane Katrina was a very large natural disaster, which damaged 22 of Rainbow's stores. According to Defendant's interpretation, this catastrophe would have generated an Ultimate Net Loss of only $8,097,000, which would not be enough for the excess policy to kick in, even though the underlying policy has paid its coverage limits. Under this interpretation, it is difficult to imaging a situation where the excess policy would actually be put to use, unless one or all of Plaintiff's corporate headquarters located in the Northeast was completely destroyed. These three buildings are the only ones on the statement of values whose total value exceeds the $10 million underlying policy limit. Thus, it is unclear why Plaintiff would have obtained coverage for all of their properties when that coverage would kick in only in extremely rare circumstances.

### iv) Extrinsic evidence supporting Defendant's interpretation of the provision is sufficient to send the issue to a jury

According to Louisiana law, a contract provision "susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code. art. 2049. Where a contract provision is ambiguous, it should be interpreted in light of the custom and usages of the industry, as well as the conduct of the parties and any prior agreements between them. La. Civ. Code art. 2053. As a last resort, ambiguous terms should be construed against the drafter. La. Civ. Code art. 2056. "It is a generally-accepted principle of the rule of construing ambiguous contract terms against the drafting party that, once the Court has determined that the contract is ambiguous, interpreting the agreement from the words of the contract and extrinsic evidence is a task for the trier of fact." *Lytal Enters., Inc. v Newfield Exploration Co.*, Case No. 06-0033, 2007 WL 1239130, at *6 (E.D. La. 2007).

In this case, Nutmeg offers the following extrinsic evidence in support of their interpretation: (1) conduct of the parties prior to issuance of the policy; (2) conduct of the parties following issuance of the policy; (3) deposition testimony of Ms. Torgerson and Mr. Darragh; (4) inclusion of the margin clause in the policy; and (5) custom and practice in the insurance industry. Rainbow disputes the probative value of this evidence and argues that none of it actually supports Nutmeg's interpretation of the provision. However, at this stage, the Court feels that Nutmeg has offered enough evidence to send the issue to a jury. It will be up to the jury to determine whether the extrinsic evidence offered by Nutmeg is probative or not. Louisiana law clearly favors this option over construing the policy against the drafter, which is a last resort.

**IV. CONCLUSION**

The Ultimate Net Loss provision in the excess policy issued by Nutmeg to Rainbow

is ambiguous.  However, Nutmeg has offered enough extrinsic evidence to create a question for

the trier of fact.  Accordingly,  Rainbow's Motion for Summary Judgment (Rec. Doc. 127) and

Nutmeg's Motion for Summary Judgment (Rec. Doc. 129) are both DENIED.

New Orleans, Louisiana, this 11th day of May, 2010.

_____
UNITED STATES DISTRICT JUDGE